1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11

DELAINE ROLAND-WARREN,

12

Plaintiff,

13

v.

14

SUNRISE SENIOR LIVING, INC.;
SUNRISE SENIOR LIVING

15

MANAGEMENT, INC.; TERRY BROWN;
CHER HORST; RAJ D'SOUZA; and DOES

16

1 through 20, inclusive,

17

Defendants.

CASE NO.  09 CV 1199 JM (WMc)

**ORDER DENYING PLAINTIFF'S
MOTION FOR REMAND**

Doc. No. 8

18        On March 17, 2009, Plaintiff Delaine Roland-Warren ("Plaintiff") filed a complaint in the

19   Superior Court of the State of California for the County of San Diego, raising claims for racial

20   discrimination, retaliation, and constructive discharge under the state's Fair Employment and Housing

21   Act, Cal. Gov't Code § 12900 *et seq.*, and for defamation, all stemming from her employment

22   relationship with Defendant Sunrise Senior Living, Inc. (Doc. No. 1, Exh. 1, "Compl.")  Defendants

23   filed an Answer to the Complaint on June 1, 2009. (Doc. No. 1, Exh. 4.) On June 2, 2009, Defendants

24   timely removed the action to federal court. (Doc. No. 1.)

25        In their Notice of Removal, Defendants claim federal subject matter jurisdiction based on

26   diversity.  28 U.S.C. §§ 1332(a), 1441(b).  Defendants allege the amount in controversy exceeds

27
28

$75,000,[1] the Sunrise corporate defendants are not California citizens as suggested by Plaintiff, and the California citizenship of the individual defendants should be disregarded because they were fraudulently joined. (Doc. No. 1 at 2-8.) At the court's request (Doc. No. 4), Plaintiff submitted an opposition to the Notice, styled as a Motion for Remand and considered by the court as such. (Doc. No. 8, "Mot.") Defendants filed an opposition to the Motion on July 7, 2009. (Doc. No. 10, "Opp'n.")

For the reasons set forth below, the court **DENIES** Plaintiff's Motion for Remand and **DISMISSES** the defamation claims against Defendants Terry Brown, Cher Horst, and Raj D'Souza without prejudice.

**I. Background**

The Sunrise organization provides senior living services across the United States, Canada, the United Kingdom, and Germany. (Opp'n at 6.) The independent living and assisted living services are offered through senior facilities called "communities." (Id.) Sunrise Senior Living, Inc. ("Sunrise") develops facilities for itself, for joint ventures, or for third parties. (Id.) Sunrise Senior Living Management, Inc. ("SSLM") is a wholly-owned subsidiary of Sunrise which "enters into operating contracts with the owners of the senior living physical facilities." (Id.)

According to the allegations in the Complaint, Plaintiff, an African-American woman, was employed with Sunrise through a temporary agency from February 13, 2006 to late March 2007. (Compl. ¶¶ 6, 12, 14.) Plaintiff was initially hired as a Charge Nurse, but was promoted in May 2006 to Director of Staff Development at a higher pay rating. (Compl. ¶ 9.) After her promotion, Plaintiff covered additional nursing shifts at her elevated hourly rate. (Id.) However, in September 2006, Plaintiff noticed her pay had been reduced to the original Charge Nurse level and that other non-African-American nurses received higher pay. (Id.) Plaintiff complained about the alleged discriminatory treatment to several Sunrise managers and directors, including the named individual defendants, without success. (Id.) On September 24, 2006, Plaintiff was demoted from her management position to that of a Licensed Vocational Nurse. (Id.)

---

[1] Plaintiff does not dispute the amount in controversy exceeds the $75,000 threshold required for diversity jurisdiction. 28 U.S.C. § 1332(b).

1     According to Plaintiff, in January 2007, she received unjustified reprimands for being late to

2 work and for failing to transcribe lab orders, while other Licensed Vocational Nurses who were not

3 African-American received no reprimands for more serious transgressions.  (Id.)  To avoid being

4 subjected further to the alleged discriminatory treatment, Plaintiff changed her status to part-time on-

5 call. (Id.) Throughout February 2007, Plaintiff was not assigned any shifts despite informing Sunrise

6 regularly of her availability.  (Compl. ¶ 12.)  When Plaintiff called Defendant D'Souza, Executive

7 Director of the facility, for an explanation, she was informed that she had been terminated because she

8 had not worked any shifts.  (Id.)  Plaintiff's temporary agency told her "D'Souza had requested that

9 plaintiff not be sent to the Sunrise facility."  (Id.)  Another Sunrise employee asked "Luz," the

10 Director of Nurses, why Plaintiff had not been assigned nursing shifts and was told, in essence, "We

11 don't need that kind of help here."  (Id.)

12     Plaintiff contends the defendants neither investigated her complaints about racial

13 discrimination and retaliation nor took any corrective action.  (Compl. ¶ 13.)  The intolerable working

14 conditions allegedly forced Plaintiff's constructive termination on March 28, 2007.  (Id.)

15     Plaintiff also alleges the defendants made defamatory statements about her, communicating

16 "in substance, the innuendos that plaintiff is incompetent, untrustworthy, and unfit for a management

17 position."  (Compl. ¶ 23.)  Plaintiff believes Defendants published the statements to, among others,

18 "Rhona Jones, Carol Treadway, Terry Brown, Peggy Tyson, Cher Horst, Ruth Sills, Raj D'Souza,

19 Jennifer Delise, Luz  (LNU), Nancy Bright, Rick (LNU), Norelle Johnson, Cheryl Martinez, [and]

20 Gayle Thomas...." (Compl. ¶ 25.) Plaintiff offers that the publications occurred between August 2006

21 and the date of her complaint.  (Compl. ¶ 22.)

22 **II.  Citizenship of Corporate Defendants**

23     In her Complaint, Plaintiff alleges Defendants Sunrise and SSLM are both incorporated under

24 California law with their principal places of business in California. (Compl. ¶ 2.) Defendants counter

25 that neither Sunrise corporation is a California citizen for diversity purposes.  (Not. ¶ 8.)  As the

26 parties' arguments focus on parent company Sunrise, the court assumes for purposes of this motion

27

28

09cv1199

1  that SSLM is not a California citizen.[2]

2    *A.  Legal Standards*

3      For diversity purposes, "a corporation shall be deemed a citizen of any State by which it has

4  been incorporated and of the State where it has its principal place of business...."  28 U.S.C. §

5  1332(c)(1).  Defendants offer Sunrise is a Delaware corporation.  (Not. ¶ 8.)  In her Motion, Plaintiff

6  has apparently conceded this point.  However, Plaintiff pursues the theory that Sunrise's principal

7  place of business is indeed California rather than Virginia, where Sunrise's corporate headquarters

8  are located.

9      To determine a corporation's principal place of business, the parties agree Ninth Circuit courts

10  first apply the "place of operations test."  Davis v. HSBC Bank Nevada, N.A., 557 F.3d 1026, 1028

11  (9th Cir. 2009); Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 500 (9th Cir. 2001)(per

12  curiam).  Under this test, the court determines whether one state "contains a substantial predominance

13  of corporate operations."  Davis, 557 F.3d at 1028.  If so, that state is the deemed the principal place

14  of business.  Otherwise, the court moves to the "nerve center test," under which the state housing the

15  majority of the corporation's executive and administrative functions is the principal place of business.

16  Id.; Indus. Techtonics, Inc. v. Aero Alloy, 912 F.2d 1090, 1092 (9th Cir. 1990).

17      Factors relevant to the "place of operations" inquiry include the "location of employees,

18  tangible property, production activities, sources of income, and where sales take place[,]" as well as

19  the location of the corporation's executive and administrative offices.  Davis, 557 F.3d at 1028; Tosco,

20  236 F.3d at 500, 502 (citing Indus. Techtonics, 912 F.2d at 1094).  Although courts have not precisely

21  defined "substantial predominance" in this context, the determination "plainly requires a comparison

22  of that corporation's business activity in the state at issue to its business activity in other individual

23  states."  Tosco, 236 F.3d at 500.  To satisfy the test, "the corporation's activity in one state must be

24  'substantially larger' than the corporation's activity in any other state."  Davis, 557 F.3d at 1029

25  (quoting Tosco, 236 F.3d at 500).  Notably, "when a corporation has operations spread across many

26  states, the nerve center test is usually the correct approach."  Davis, 557 F.3d at 1029.

27  _____

28      [2] Plaintiff mentions she was unable to find specific information regarding SSLM's facility locations.  (Mot. at 4, fn. 1.)  As mentioned above, SSLM is headquartered in Virginia and manages contractual obligations for the assisted living organization.

1    The court also notes the burden of persuasion on this issue falls on "the party seeking to invoke

2    the court's diversity jurisdiction."   Ghaderi v. United Airlines, Inc., 136 F.Supp.2d 1041, 1045

3    (N.D.Cal. 2001) (citing Indus. Techtonics, 912 F.2d at 1092.  Thus, employing the Tosco test, the

4    defendants bear the burden of showing Sunrise is not a California citizen.

5    *B.  Analysis*

6    In evaluating whether California hosts a "substantial predominance" of Sunrise's corporate

7    activities, the court reviews the distribution of activities through the comprehensive data provided by

8    Defendants.[3]  The Sunrise evidence on its U.S. operations is as follows:

9    1) Communities (374): California, 56 (14.97%); New Jersey, 28 (7.49%); Illinois, 25 (6.68%);

10   Virginia, 24 (6.42%); Pennsylvania, 23 (6.15%); Ohio, 20 (5.35%); and Georgia, 18 (4.81%).

11   2) Residents (35,423): California (14.33%); New Jersey (7.90%); Virginia (7.89%); Illinois

12   (6.58%); Florida (6.50%); Pennsylvania (5.77%); and Maryland (4.91%).

13   3) Employees (35,336): California (14.28%); Virginia (8.13%); New Jersey (7.46%); Illinois

14   (7.27%); Pennsylvania (5.73%); New York (5.47%); and Maryland (4.93%).

15   4) Property Owned or Operated (32 million sq. ft.): California (14.17%); Virginia (9.29%);

16   Florida (8.31%); Maryland (6.86%); New Jersey (6.53%); Illinois (6.02%); and Pennsylvania

17   (5.90%).

18   5) Sales Revenue ($2.1 billion): California (15.88%); New Jersey (8.31%); Illinois (7.60%);

19   Virginia (7.44%); Pennsylvania (5.77%); New York (5.59%); and Maryland (4.99%).

20   (Opp'n, Decl. of Maryann R. Owen.)

21   Plaintiff argues California meets the "place of operations test" because twice as many Sunrise

22   communities are in California than in New Jersey, the second highest domestic representation.  (Mot.

23

24   [3] Plaintiff requests the court take judicial notice of statistics provided in motion exhibits 1-6,
documented on pages from Sunrise's 2008 10-K filing.  (Mot., Decl. of Walter H. Root, ¶ 8.)

25   Jurisdiction is assessed as of the date of removal which was June 2, 2009.  Ghaderi, 136 F.Supp.2d
at 1045 fn. 3.  Defendants provide statistics as of June 26, 2009, a date more relevant to the present

26   motion than the December 31, 2008 fiscal year-end date reflected in the 10-K filing.  The court
therefore declines to take judicial notice of Plaintiff's data because it is less relevant to the issue at

27   hand.  Furthermore, the statistics provided by each party reflect roughly the same distribution of
activity among individual states and thus, reliance on Defendants' figures would not significantly alter

28   Plaintiff's statistical arguments.  For these reasons, Defendants' figures are recited in the present
analysis.

at 4.)  In addition, Plaintiff points out there are approximately 78% more residents in Sunrise's California facilities than in second-place Virginia.  (Id.)  While Plaintiff suggests these numbers represent Sunrise's significantly greater exposure to litigation in California, her analysis does not take the figures into the context advocated by the Ninth Circuit.

Plaintiff relies primarily on Ghaderi, where the court compared United Airlines' business activity in California and Illinois, two states which together accounted for more than 50% of the company's employees, passengers, assets, and revenues.  Ghaderi, 136 F.Supp.2d at 1045-46.  The Ghaderi court noted that where a corporation has a high concentration of its activity in two states, the gap between the two need not be substantial for one to pass the Tosco test.  Id. at 1047.  Although United was headquartered in Illinois, the court ultimately concluded California was its place of operations.  Id. at 1046-47.  Here, as Sunrise's operations are not concentrated in one or two states, Ghaderi's facts are distinguishable.

"The substantial predominance test does not require that a majority of corporate operations occur in a single state, . . . [b]ut the test requires a 'substantial' predominance, not mere predominance."  Davis, 557 F.3d at 1029.  In Davis, cited by Sunrise, Defendant Best Buy had the largest percentage of activity in California in terms of stores (11%), sales (13%), and employees (13%).  Davis, 557 F.3d at 1032.  Texas had the next largest proportion in each category, at 9 to 10%.  Id. at 1032-33.  The court found the company's predominance in California to "roughly reflect California's larger population[,]" observing the company's *per capita* exposure to consumers was actually less in California than elsewhere.  Id. at 1029, 1030 fn. 4. Considering the rationale for the diversity statute, the Davis court observed that if raw numbers alone could confer California citizenship on a corporation, "nearly every national retailer–no matter how far flung its operations–will be deemed a citizen of California...."  Id. at 1029-30.  The court reversed the district court's ruling that California had satisfied the Tosco "place of operations" test.  Id. at 1030.

Similarly, in Ho v. Ikon Office Solutions, Inc., 143 F.Supp.2d 1163, 1167 (N.D.Cal. 2001), the court found no state satisfied the place of operations test for Defendant Ikon because none held a "substantial percentage of Ikon's business activity."  Further, there were "a good many states in which the level of Ikon's activity, measured as a percentage of all the corporation's business, [was]

1  only a few percentage points less than in California." Id. at 1167.

2         Finally, in Arellano v. Home Depot U.S.A., Inc., 245 F.Supp.2d 1102 (S.D.Cal. 2003), a case

3  out of this district, the court considered Home Depot's place of operations.  Home Depot maintained

4  stores in 49 states, with 15.1% of its employees in California, 9.3% in Georgia, 6.9% in New York,

5  and 6.9% in Texas.  Arellano, 245 F.Supp.2d at 1106.  The court found Home Depot had no

6  substantial predominance in any state.  Id. at 1108.  Where a national corporation's contacts are

7  "spread relatively evenly among many states," a small margin of difference among several states is

8  insufficient to show a substantial predominance of activity in any one state. Id. at 1107.  Furthermore,

9  "[b]ecause California is the state with the largest population, business activity on a national scale can

10 be expected to be greater in California."  Id. (citing Ho, 143 F.Supp.2d at 1167-68).  The court held

11 Ikon's place of operations was not California.

12        Upon review of the statistics in the present case, the court finds the distribution of Sunrise's

13 business activities closely parallels that observed in Davis, Ho, and Arellano.  No one state

14 substantially predominates over the others in terms of property, employees, customers, or sales

15 revenue.  Once the population differentials among the most heavily represented states are considered,

16 other states actually contend for the top spot.  For example, Sunrise maintains one senior living

17 community for every 656,369 residents of California, yet one for every 323,712 Virginia residents.

18 (Opp'n at 12.)

19        Muddying the waters further, the court must also take into account the location of Sunrise's

20 executive and administrative functions.  Tosco, 236 F.3d at 502.  Here, it is undisputed that Sunrise

21 maintains all of its executive and administrative functions at its corporate headquarters in northern

22 Virginia, including its executive offices and its "finance, development, accounting, purchasing,

23 marketing, training, human resources, information systems, and legal departments." (Opp'n at 14-15,

24 Decl. of Maryann R. Owen, ¶ 15.)  Sunrise does not maintain any regional offices.  (Opp'n, Owen

25 Decl., ¶ 17.) The company has strong historical ties to and significant brand recognition in the Fairfax

26 County area.  (Opp'n ¶¶ 4-6, 9.)

27        Based on the preceding analysis, the court finds no state contains a substantial predominance

28 of Sunrise's business activities.  Thus, the court defers to the "nerve center" test for determining

1    Sunrise's principal place of business.  Indus. Techtonics, 912 F.2d at 1092.  As discussed above, the

2    evidence demonstrates the bulk of Sunrise's executive and administrative functions take place in

3    Virginia.  Thus, the court concludes Sunrise is a citizen of Delaware and Virginia, and that diversity

4    of citizenship exists between it and Plaintiff, a California citizen.

5    **III.  Fraudulent Joinder of Individual Defendants**

6          In the Complaint, individual defendants Raj D'Souza, Cher Horst, and Terry Brown are

7    charged only with defamation.  Both Plaintiff and Defendants recognize these defendants are

8    California citizens for diversity purposes.  Sunrise argues these defendants were fraudulently joined[4]

9    in the action and their citizenship should be disregarded in evaluating whether complete diversity

10   exists.  Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067 (9th Cir. 2001).

11   *A.  Legal Standards*

12         "The burden of establishing federal jurisdiction is upon the party seeking removal...and the

13   removal statute is strictly construed against removal jurisdiction."  Emrich v. Touch Ross & Co., 846

14   F.2d 1190, 1195 (9th Cir. 1988) (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921)

15   and Salveson v. Western States Bankcard Ass'n, 731 F.2d 1423, 1426 (9th Cir. 1984)).  However, a

16   plaintiff may not avoid the reach of the diversity statute by joining a non-diverse defendant without

17   stating a viable claim against that defendant.  Ritchey v. Upjohn Drug Co., 139 F.3d 1313, 1318 (9th

18   Cir. 1998), cert. denied, 525 U.S. 963 (1998).  Under Ninth Circuit precedent, the key question for the

19   court is whether the Complaint "fails to state a cause of action against a resident defendant, and the

20   failure is obvious according to the settled rules of the state."  Morris, 236 F.3d at 1067.  The standard

21   parallels that used in deciding motions to dismiss under Rule 12(b)(6).  Id. at 1067-68; Ritchey, 139

22   F.3d at 1319-20; McCabe, 811 F.2d at 1339.  Thus, the complaint's "factual allegations must be

23   enough to raise a right to relief above the speculative level...."  Bell Atl. Corp. v. Twombly, 550 U.S.

24   544, 556 (2007) (allegations must provide "plausible grounds to infer" that plaintiff is entitled to

25   relief).  Furthermore, the claim fails if it lacks facts sufficient to support a cognizable legal theory.

26   Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

27   _____

28         [4] As many courts have noted, "fraudulent" or "sham" joinder is a term of art and is not
     intended to reflect the Plaintiff's mental state in joining the particular defendants.  McCabe v. Gen.
     Foods Corp., 811 F.2d 1336, 1339 (9th Cir. 1987).

Sunrise argues Plaintiff has failed to state a claim for defamation against the individual defendants because she has not sufficiently identified any statements which would survive the applicable statute of limitations.  "Under California law, although a plaintiff need not plead the allegedly defamatory statement verbatim, the allegedly defamatory statement must be specifically identified, and the plaintiff must plead the substance of the statement." Jacobson v. Schwarzenegger, 357 F.Supp.2d 1198, 1216 (C.D.Cal. 2004) (citing Okun v. Superior Court, 29 Cal.3d 442, 458 (1981), cert. denied, 454 U.S. 1099 (1981)).  "Even under liberal federal pleading standards, 'general allegations of the defamatory statements' which do not identify the substance of what was said are insufficient." Id. (citing Silicon Knights, Inc. v. Crystal Dynamics, Inc., 983 F.Supp. 1303, 1314 (N.D.Cal. 1997)).  The applicable statute of limitations for a defamation claim under California law is one year.  Cal. Civ. Proc. Code § 340(c).

*B. Analysis*

As mentioned above, Plaintiff alleges that while she was employed at Sunrise, her temporary agency told her "D'Souza had requested that plaintiff not be sent to the Sunrise facility," and that Sunrise Director of Nurses "Luz," told another Sunrise employee, "We don't need that kind of help here." (Compl. ¶ 12.)  As these statements were made prior to Plaintiff's departure in March 2007, they fall outside the limitations period and thus, do not provide an adequate basis for Plaintiff's defamation claim.

Plaintiff offers the defendants communicated statements to a number of possible recipients which suggested, "in substance, the innuendos that plaintiff is incompetent, untrustworthy, and unfit for a management position." (Compl. ¶¶ 23, 25.)  Plaintiff alleges these statements were published sometime between August 2006 and the date of her Complaint.  (Compl. ¶ 22.)

Sunrise argues these contentions lack a sufficient factual predicate to survive dismissal. (Opp'n at 21-23.)  Plaintiff contends she should not be required to provide the particulars at this stage because the "exact details of each defamatory statement are better known to the defendants who made them." (Mot. at 7.)  Plaintiff relies on Okun, *supra*, and Schessler v. Keck, 125 Cal.App.2d 827 (1954), for this proposition, but fails to note the factual distinctions between those cases and her own. In Okun, the court specifically noted the complaint did provide sufficient details regarding the time,

1  place, and recipients of the statements.  Okun, 29 Cal.3d at 458.  Such allegations, along with a

2  detailed substantive description of the allegedly defamatory statements, put the defendants on

3  sufficient notice of the charges against them.  Id.  Similarly, in Schessler, although the court allowed

4  the plaintiff to support part of her claim with contentions that statements were made at "various times

5  and places to numerous persons," the complaint was packed with specific details of related statements.

6  Schessler, 125 Cal.App.2d at 830.

7      In contrast, Defendants direct the court to three cases which stand on comparable factual

8  footing with the present case.  In Silicon Knights, the plaintiff company alleged the defendants had

9  made "false and defamatory statements" to the company's customers about the "quality and

10 reliability" of its products, the "competence and ability" of its employees, and its "cooperation and

11 ability to work with customers, suppliers," or others in the industry.  Silicon Knights, 983 F.Supp. at

12 1313-14.  Although the plaintiff identified the speaker, time, place, and recipients of the statements,

13 the court dismissed the claim, finding the complaint set forth only "general allegations of the

14 defamatory statements and [did] not identify the substance" of what was said.  Id. at 1314.  In addition,

15 the statements appeared "to be expressions of opinion rather than factual assertions."  Id.

16     Although the two other cases cited by Defendants are unpublished, the court finds their

17 analyses informative.  In Williams v. County of Los Angeles, 2006 U.S. Dist. LEXIS 96769, at *14-15

18 (C.D.Cal. Jun. 19, 2006), the plaintiff claimed the defendant made "defamatory" statements about her

19 "work performance, ethics, veracity, alleged criminal conduct and competency."  Even though the

20 statements clearly related to the plaintiff's work performance, the assertions were too vague to put the

21 defendant on fair notice of the basis for the plaintiff's claim.  Id. at *15-17.  Without more specific

22 factual allegations regarding the statements' substance or the context in which they were made, the

23 court was unable to assess whether the statements were privileged or whether they were intended as

24 opinion or factual assertion.  Id. at *16.  Finally, in Jones v. Thyssenkrupp Elevator Corp., 2006 U.S.

25 Dist. LEXIS 13978, at *15 (N.D.Cal. Mar. 14, 2006), the plaintiff claimed the defendant made false

26 comments which "expressly and impliedly stated that Plaintiff was dishonest, lazy, incompetent and

27 a poor performer."  The plaintiff noted that while "the precise dates of these publications are not

28 known...[she] believes that the publication may have started in December 2003" and were continuing.

1    Id. at *15, 19.  The Jones court dismissed the claim because "[n]owhere in the FAC does Ms. Jones

2    provide any reference to the speakers of the defamatory communications, the recipients, the timing,

3    or the context in which they were made, sufficient to provide [the defendant] sufficient notice of the

4    issues to enable preparation of a defense."  Id. at *17.  Furthermore, the plaintiff's general belief that

5    republication of the statements was ongoing did not parry the one-year statute of limitations.  Id. at

6    *19.

7            In the present case, Plaintiff merely alleges the defendants made statements suggesting she was

8    "incompetent, untrustworthy, and unfit for a management position" and that the statements were made

9    sometime between August 2006 and March 17, 2009, the date she filed her Complaint.  (Compl. ¶¶

10   22-23, 25.)  Plaintiff does not identify the time, place, particular speakers, or recipients of these

11   statements, nor does she mention their substance or context.  The court cannot determine whether the

12   statements were intended as opinion or fact or whether they were privileged.  The assertions fail to

13   put Defendants on notice of the factual underpinnings of Plaintiff's claim.

14           Plaintiff mentions she will seek leave of court to amend her complaint when discovery reveals

15   certain details of the alleged defamation.  (Compl. ¶ 25.)  However,  fraudulent joinder is assessed

16   based on the assertions in the complaint, not on the potential yield of future discovery.  TPS Utilicom

17   Servs., Inc. v. AT&T Corp., 223 F.Supp.2d 1089, 1103 (C.D.Cal. 2002) ("[T]he propriety of removal

18   is determined at the time of removal – not according to the factual allegations stated at a later date.").

19           Because Plaintiff has failed to state a claim for defamation against California citizen

20   defendants Raj D'Souza, Cher Horst, and Terry Brown, the court concludes these defendants have

21   been fraudulently joined in the action.  As complete diversity exists among the remaining defendants,

22   this court enjoys federal subject matter jurisdiction over the dispute and removal was proper.  28

23   U.S.C. §§ 1332(a), 1441(b).

24   **IV.  Plaintiff's Request for Sanctions**

25           Plaintiff requests the court order for Defendants to pay costs and attorney fees incurred by

26   Plaintiff as a result of the removal pursuant to 28 U.S.C. § 1447(c).  (Mot. at 8.) Because removal was

27   proper, the court declines to make such an award.

28   //

1

**V.  Conclusion**

2

      For the reasons set forth above, Plaintiff's motion for remand is **DENIED**.  Accordingly,

3

Plaintiff's claim for defamation against Raj D'Souza, Cher Horst, and Terry Brown is **DISMISSED**

4

**WITHOUT PREJUDICE**.

5

DATED:  August 4, 2009

6

Hon. Jeffrey T. Miller

7

United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv1199